# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

Civil Action No. 4:20-CV-182

| | |
|---|---|
| TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives, PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, BOBBY HEATH, MAXINE WHITLEY, and ALAN SWAIN,<br><br>        Plaintiffs,<br><br>  v.<br><br>DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, STELLA ANDERSON, in her official capacity as a member of the North Carolina State Board of Elections, JEFF CARMON, III, in his official capacity as a member of the North Carolina State Board of Elections, and KAREN BRINSON BELL, in her official capacity as the Executive Director of the North Carolina State Board of Elections,<br><br>        Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.    The Elections Clause of the Constitution—Article I, Section 4, clause 1—says that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. CONST. art. 1, §4, cl. 1 (emphasis added). The Constitution thus entrusts the power to regulate federal elections in the

1

first instance to the branch of state government that is closest to the people. In North Carolina that is the General Assembly. The aim of this assignment of authority, as John Jay explained to the New York ratification convention, is to ensure that the rules governing federal elections are determined by "the will of the people." 2 *Debates on the Federal Constitution* 327 (J. Elliot 2d ed. 1836).

2.  The North Carolina Board of Elections is not the "Legislature," and it is not Congress, yet the Board released three Memoranda, dated September 22, 2020, to set new "Times" and new "Manners" for elections in North Carolina. These Memoranda effectively gut the Witness Requirement, set by the General Assembly in the Bipartisan Elections Act of 2020, 2020 N.C. Sess. Laws 2020-17 § 1.(a); extend the Receipt Deadline for ballots to *nine days* after Election Day, undoing the deadline set by the General Assembly in N.C. GEN. STAT. § 163-231(b)(2)(b); water down the Election Day postmark requirement, also set by the General Assembly in N.C. GEN. STAT. § 163-231(b)(2)(b); and revise the procedures for preventing ballot harvesting by making it easier to drop off ballots illegally. By usurping the General Assembly's constitutional prerogative to "[p]rescribe" the "Times, Places and Manners" of the federal election, the Board is violating the Elections Clause.

3.  The Board's ad hoc Memoranda changing the rules regulating the ongoing federal election also violate the Equal Protection Clause. As of filing 239,705 North Carolinians have cast their ballots—including 129,464 Democrats and 39,094 Republicans—and 1,028,648 have requested absentee ballots—including 504,556 Democrats and 185,393 Republicans—the vast majority *before* the Board arbitrarily changed the rules. Absentee Data, North Carolina State Board of Elections (Sept. 26, 2020), *available at* https://bit.ly/33SKzAw. The Board is thus administering the election in an arbitrary and nonuniform manner that inhibits voters who have *already* voted

under the previous rules from "participat[ing] in" the election "on an equal basis with other citizens in" North Carolina. *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *see also Bush v. Gore*, 531 U.S. 98, 105 (2000)). And the Board's Memoranda allow otherwise unlawful votes to be counted, thereby deliberately diluting and debasing lawful votes. These are clear violations of the Equal Protection Clause of the Fourteenth Amendment.

4.      Plaintiffs seek appropriate declaratory and injunctive relief preventing these imminent, if not already ongoing, violations of law.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 18 U.S.C.§§ 1331, 1343, 1357 and 42 U.S.C. § 1983 because this action arises under the Constitution of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, 1357 and 42 U.S.C. § 1983.

6.      Venue is appropriate in this district under 28 U.S.C. § 1391(b) and under Local Rule 40.1(c)(1) because Plaintiff Bobby Heath is a resident of Pitt County in the Eastern District's Eastern Division, Plaintiff Whitley is a resident of Nash County and Plaintiff Swain is a resident of Wake County, both of which are in the Eastern District's Western Division, and Defendants' official offices are in Wake County, which is in the Eastern District's Western Division.

## PARTIES

7.      Plaintiff Timothy K. Moore is the Speaker of the North Carolina House of Representatives. He represents the 111th State House District. As the leader of the North Carolina House of Representatives, he represents the institutional interests of that body in this case. He appears in his official capacity.

8.      Plaintiff Philip E. Berger is the President Pro Tempore of the North Carolina Senate. He represents the State's 30th Senate District. He has taken an oath to support and defend

the Constitution of the United States and the Constitution of North Carolina. As the leader of the North Carolina Senate, he represents the institutional interests of that body in this case. He appears in his official capacity.

9.      Plaintiff Bobby Heath is a resident of Pitt County, North Carolina. He has been a registered voter in North Carolina since March 1980 and has voted in virtually every election since that time. Mr. Heath voted absentee by mail in the November 2020 general election under the rules requiring a single witness for his absentee ballot. Mr. Heath returned his absentee ballot by mail and according to the State Board of Elections' website that ballot was accepted on September 21, 2020.

10.     Plaintiff Maxine Whitley is a resident of Nash County, North Carolina. She has been a registered voter in North Carolina since October 1964 and has voted in virtually every election since that time. Mrs. Whitley voted absentee by mail in the November 2020 general election under the rules requiring a single witness for her absentee ballot. Mrs. Whitley returned her ballot by mail and according to the State Board of Election's website that ballot was accepted on September 17, 2020.

11.     Plaintiff Alan Swain is a resident of Wake County, North Carolina and is running as a Republican candidate to represent the State's 2nd Congressional District.

12.     Defendant Damon Circosta is the Chair of the North Carolina State Board of Elections, which is the agency that is charged with administration of North Carolina's election laws and with the "general supervision over the primaries and elections in the State." N.C. GEN. STAT. § 163-22(a). He is named in his official capacity.

13.     Defendant Stella Anderson is a member of the North Carolina State Board of Elections. She is named in her official capacity.

14. Defendant Jeff Carmon, III, is a member of the North Carolina State Board of Elections. He is named in her official capacity.

15. Defendant Karen Brinson Bell is the Executive Director of the North Carolina State Board of Elections. She is named in her official capacity.[1]

## BACKGROUND

### The General Assembly Established the Rules for the Election

16. Article I, Section 4, clause 1 of the U.S. Constitution states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators." U.S. CONST. art. 1, § 4, cl. 1.

17. The Elections Clause was "not . . . of uncertain meaning when incorporated into the Constitution." *Hawke v. Smith*, 253 U.S. 221, 227 (1920). And "the Legislature" means now what it meant then, "the representative body which ma[kes] the laws of the people." *Id*. The Elections Clause thus does not grant the power to regulate elections to states, but only to the state's legislative branch.

18. Article II, Section 1 of the North Carolina State Constitution creates the North Carolina "Legislature" by vesting the "legislative power" exclusively in "the General Assembly, which shall consist of a Senate and a House of Representatives." *See also State v. Berger*, 781 S.E.2d 248, 250 (N.C. 2016). As the "the legislative branch," the General Assembly "enacts laws

---

[1] The North Carolina State Board of Elections is generally five members. Two members resigned on September 23, 2020, alleging they had not been properly advised of the consequences of the Board's policy changes as reflected in the Memoranda. *See 'Blindsided': GOP Elections Board Members Resign Over Absentee Ballot Settlement*, WSOCTV.COM (Sept. 24, 2020), https://www.wsoctv.com/news/local/2-gop-members-nc-state-board-elections-resign-report-says/O4OKQMNVWNEEBLQMKGZLGMNXOQ; *see also* David Black Resignation Letter (Sept. 23, 2020) (attached hereto as Ex. 6); Ken Raymond Resignation Letter (Sept. 23, 2020) (attached hereto as Ex. 7).

5

that protect or promote the health, morals, order, safety, and general welfare of society." *Id.* (internal quotation marks omitted).

19.     As North Carolina's "Legislature," the General Assembly is tasked with regulating federal elections in North Carolina. U.S. CONST. art. 1, § 4, cl. 1. Accordingly, the General Assembly has exercised its federal constitutional authority to establish rules governing the manner of federal elections in North Carolina and many options for North Carolinians to exercise their right to vote.

20.     Voters may cast their ballots in person at their assigned polling place on Election Day, which this year is November 3, 2020.

21.     Voters who are "able to travel to the voting place, but because of age or physical disability and physical barriers encountered at the voting place [are] unable to enter the voting enclosure to vote in person without physical assistance . . . shall be allowed to vote either in [their] vehicle[s] . . . or in the immediate proximity of the voting place." N.C. GEN. STAT. § 163-166.9(a). This is commonly known as curbside voting.

22.     Voters can vote early. North Carolina has established a 17-day early voting period beginning the third Thursday before the election through the last Saturday before the election at any early voting site in their county. N.C. GEN. STAT. §§ 163-227.2, 163-227.6. This means early voting starts this year on October 15, 2020. To ensure access, the same curbside voting accommodations are available at early voting sites. *See* Vote Early In-Person, N.C. STATE BD. OF ELECTIONS, https://bit.ly/3082mTf (last accessed Sept. 26, 2020).

23.     Further, voters can vote by absentee ballot either early or on Election Day and without any special circumstance or reason necessary. See N.C. GEN. STAT. §§ 163-226, 163-230.2, 163-231.Voters can request an absentee ballot. But so too can the voter's near relative,

6

verifiable legal guardian, or member of a multipartisan team trained and authorized by the county board of elections on the voter's behalf. N.C. GEN. STAT. § 163-230.2.

24.     To return a completed absentee ballot, a voter must have it witnessed and then mail or deliver the ballot in person, or have it delivered by commercial carrier. In addition, the voter's near relative or verifiable legal guardian can also return the ballots in person. N.C. GEN. STAT. § 163-231. But other than the voter's near relative or verifiable legal guardian, the General Assembly has criminally prohibited any other person from "return[ing] to a county board of elections the absentee ballot of any voter." N.C. GEN. STAT. § 163-226.3(a)(5).

25.     In general, absentee ballots must be returned to the local county board of elections by either (a) 5:00 p.m. on Election Day or (b) if postmarked by Election Day, the absentee ballots must be received "no later than three days after the election by 5:00 p.m." N.C. GEN STAT. § 163-231(b)(2)(b). This is the Receipt Deadline.

26.     In short, the General Assembly has enacted numerous means for North Carolinians to vote and provided clear rules to regulate those means.

**The General Assembly Revises Election Laws in the Bipartisan Elections Act of 2020**

27.     The General Assembly has also ensured that North Carolina's election laws have been updated to respond to the issues presented by the ongoing COVID-19 pandemic.

28.     Governor Cooper declared a state of emergency on March 10, 2020 due to the COVID-19 pandemic. North Carolina elections officials soon understood that it may be appropriate to adjust the State's voting laws to account for the pandemic.

29.     North Carolina State Board of Elections Executive Director Karen Brinson Bell submitted a letter to Governor Cooper and to legislative leaders recommending several "statutory changes" on March 26, 2020.

7

30.     In her letter, Director Bell requested that, among other things, the General Assembly "[r]educe or eliminate the witness requirement." Director Bell explained that such action was recommended to "prevent the spread of COVID-19." She further argued that "[e]liminating the witness requirement altogether is another option." N.C. State Board of Elections, *Recommendations to Address Election-Related Issues Affected by COVID-19* at 3 (March 26, 2020), https://bit.ly/369EBOO (attached hereto as Ex. 4).

31.     On June 11, 2020, the General Assembly passed bipartisan legislation adjusting the voting rules for the November Election by an overwhelming 142–26 margin. *See* Bipartisan Elections Act of 2020, 2020 N.C. Sess. Laws 2020-17. Governor Cooper signed the duly passed bill into law the next day.

32.     The Bipartisan Elections Act made a number of adjustments to North Carolina's election laws, including some of which Director Bell requested. The Act expands the pool of authorized poll workers to include county residents beyond a particular precinct, 2020 N.C. Sess. Laws 2020-17 § 1.(b); allows absentee ballots to be requested online, by fax, or by email, *id*. §§ 2.(a), 7.(a); directs the Board to develop guidelines for assisting registered voters in nursing homes and hospitals, *id*. § 2.(b); gives additional time for county boards to canvass absentee ballots, *id*. § 4; and provides over $27 million in funding for election administration, *id*. § 11.

33.     In the Bipartisan Elections Act, the General Assembly also changed the Witness Requirement for absentee ballots. Normally under North Carolina law, absentee ballots require two qualified witnesses. *See* N.C. Gen. Stat. § 163-231.

34.     But for the 2020 Election, the Bipartisan Elections Act provides that an "absentee ballot shall be accepted and processed accordingly by the county board of elections if the voter marked the ballot in the presence of *at least one person* who is at least 18 years of age and is not

8

disqualified by G.S. 163–226.3(a)(4) or G.S. 163–237(c)." *See* Bipartisan Elections Act of 2020, 2020 N.C. Sess. Laws 2020-17 § 1.(a) (emphasis added).

35. The one absentee ballot witness is still required to sign "the application and certificate as a witness" and print their "name and address" on the absentee ballot's return envelope. *Id.*

36. The Bipartisan Elections Act did not accept Director Bell's recommendation to "[e]liminat[e] the witness requirement altogether." *Recommendations to Address Election-Related Issues Affected by COVID-19* at 3.

37. The Bipartisan Elections Act also did not change the Receipt Deadline for absentee ballots, which remains set by statute as three days after the election by 5:00 p.m.

38. The Bipartisan Elections Act did not alter the prohibition on "any person" "tak[ing] into that person's possession for delivery to a voter or for return to a county board of elections the absentee ballot of any voter." N.C. GEN. STAT. § 163-226.3(a)(5). This remains clearly illegal as a matter of North Carolina law.

**Director Bell and the Board Attempted to Assert Emergency Powers to Change the Election Laws**

39. Director Bell has previously maintained that she is authorized to issue emergency orders to conduct an election where the normal schedule is disrupted "pursuant to [her] authority under G.S. § 163-27.1 and 08 NCAC 01.0106." N.C. State Bd. of Elections, Numbered Memo 2020-14 at 1 (July 23, 2020), https://bit.ly/2EyXPlt. As relevant here, N.C. GEN. STAT. § 163-27.1 states that the Director "may exercise emergency powers to conduct an election in a district where the normal schedule for the election is disrupted by" either "(1) [a] natural disaster" or "(2) [e]xtremely inclement weather."

9

40.     N.C. ADMIN. CODE 1.0106 explains that, for the purposes of § 163-27.1, a "natural disaster or extremely inclement weather include a . . . catastrophe arising from natural causes resulted [sic] in a disaster declaration by the President of the United States or the Governor."

41.     Director Bell does not have sweeping authority to revise the North Carolina's elections statutes for the 2020 Election under the "natural disaster" provision.

42.     The North Carolina Rules Review Commission unanimously rejected—by a vote of 9–0, see Rules Review Commission Meeting Minutes at 4 (May 21, 2020), https://bit.ly/308WSHW (attached hereto as Ex. 8)—the Board's proposed changes to N.C. Admin Code 1.0106 that would have clarified that

> "Catastrophe arising from natural causes" includes a disease epidemic or other public health incident that makes it impossible or extremely hazardous for elections officials or voters to reach or otherwise access the voting place or that creates a significant risk of physical harm to persons in the voting place, or that would otherwise convince a reasonable person to avoid traveling to or being in a voting place.

Proposed Amendments to 08 N.C. ADMIN. CODE 01.0106 (Mar. 19, 2020), https://bit.ly/3082lyO.

43.     In declining to approve the changes to the rule, the Rules Review Commission explained that the Board "does not have the authority to expand the definition of 'natural disaster' as proposed" in the amendments. Rules Review Commission Meeting Minutes at 4.

44.     Accordingly, Director Bell and the Board do not have any delegated authority to rewrite North Carolina's election laws.

**The Board Agreed with Private Litigants to Usurp North Carolina's Election Statutes**

45.     On August 10, 2020, nearly two months after the General Assembly's enactment of the Bipartisan Elections Act, the North Carolina Alliance for Retired Americans, a social welfare organization comprised of retirees from public and private unions, community organizations, and individual activists, together with seven individual North Carolina voters filed

suit in the Wake County Superior Court. *See North Carolina Alliance for Retired Americans, et al. v. North Carolina State Board of Elections* ("*Alliance*"), No. 20-CVS-8881 (Wake Cnty. Super. Ct.).

46.    The *Alliance* plaintiffs named as a defendant one of the named Defendants in this action, Board Chair, Damon Circosta.

47.    The *Alliance* plaintiffs sought injunctive relief, seeking numerous alterations to North Carolina's election statutes.

48.    Among their requested relief, *Alliance* plaintiffs sought to "[s]uspend the Witness Requirement for single-person or single-adult households." Pls.' Compl. at 4, *Alliance*, No. 20-CVS-8881 (Wake Cnty. Super Ct. Aug. 10, 2020).

49.    *Alliance* plaintiffs further requested an extension of the Receipt Deadline to "[r]equire election officials to count all absentee ballots mailed through USPS and put in the mail by Election Day if received by county boards up to nine days after Election Day." *Id.*

50.    *Alliance* plaintiffs also sought to "[p]reliminarily and temporarily enjoin the enforcement of the" criminal prohibition on delivering another voter's absentee ballot. *Id.* at 39.

51.    Legislative Plaintiffs Moore and Berger successfully intervened to defend the duly-enacted election regulations, as it is their absolute right to do under State law.

52.    But before the state court had an opportunity to decide *Alliance* plaintiffs' motion for a preliminary injunction, the Board and the *Alliance* plaintiffs came to terms on a proposed consent judgment. Plaintiffs' and Executive Defendants' Joint Motion for Entry of a Consent Judgment, *Alliance*, No. 20-CVS-8881 (Wake Cnty. Super. Ct. Sept. 22, 2020) (attached hereto as Ex. 1).

11

53. The Board released three Numbered Memoranda, at the same time as announcing the consent judgment.[2] Each Memorandum undoes validly enacted statutes passed by the General Assembly's exclusive prerogative to regulate federal elections. Each Memorandum is dated September 22, 2020.

54. Numbered Memo 2020-19 "directs the procedure county boards must use to address deficiencies in absentee ballots." Originally released August 21, 2020, the Board revised this Memo in a manner that eviscerates the Witness Requirement mandated by Section 1.(a) of the Bipartisan Elections Act. N.C. State Bd. of Elections, Numbered Memo 2020-19 at 1 (August 21, 2020, revised Sept. 22, 2020), https://bit.ly/333yE3H (original version attached hereto as Ex. 3; revised version attached hereto as Ex. 1 at 32–37).

55. If a "witness . . . did not print name," "did not print address," "did not sign," or "signed on the wrong line," the Board will allow the absentee voter to "cure" the deficiency. A voter cures a Witness Requirement deficiency through a "certification." *Id.* at 2.

56. The Board's "certification" is simply a form sent to the voter by the county board. And the voter can return the form to the county board at anytime until 5:00 p.m., November 12, 2020 and may do so via fax, email, in person, or by mail or commercial carrier. *Id.* at 3–4.

57. For a missing witness, the "certification" does not require the voter to resubmit a ballot in accordance with the Witness Requirement mandated by Section 1.(a) of the Bipartisan

---

[2] Numbered Memo 2020-19 is available on the Board's Numbered Memo page. *See* Numbered Memos, N.C. STATE BD. OF ELECTIONS, https://bit.ly/367Ffw8 (last accessed Sept. 26, 2020). But Numbered Memos 2020-22 and 2020-23 for some reason are not available. These Memoranda are dated September 22, 2020 and are publicly available through a link to the Board's joint motion in the Board's press release announcing the motion. *See* N.C. State Bd. of Elections, *State Board Updates Cure Process to Ensure More Lawful Votes Count* (Sept. 22, 2020) (attached hereto as Ex. 2) (linking to the Board's joint motion at https://bit.ly/2S5qBNr). Numbered Memo 2020-19 also cross references Numbered Memo 2020-22. *See* Numbered Memo 2020-19 at 4.

Elections Act. Instead, the "certification" lets the voter skip the Witness Requirement altogether. *Id.*

58.    All a voter must do is sign and affirm the following affidavit:

> I am submitting this affidavit to correct a problem with missing information on the ballot envelope. I am an eligible voter in this election and registered to vote in [name] County, North Carolina. I solemnly swear or affirm that I voted and returned my absentee ballot for the November 3, 2020 general election and that I have not voted and will not vote more than one ballot in this election. I understand that fraudulently or falsely completing this affidavit is a Class I felony under Chapter 163 of the North Carolina General Statutes.

59.    Thus, the Board through Numbered Memo 2020-19's "certification" allows absentee voters to be their own witness and vitiates the Witness Requirement. This is directly contrary to clear text of the Bipartisan Elections Act. Notably, in federal litigation challenging the Witness Requirement, Director Bell testified under oath that an absentee ballot with "no witness signature" could not be cured and therefore elections officials would have to "spoil that particular ballot" and require the voter to vote a new one. Evidentiary Hearing Tr. at 122, *Democracy N.C. v. N.C. State Bd. of Elections*, No. 20-cv-457 (M.D.N.C. July 21, 2020) (attached hereto as Ex. 5).

60.    Director Bell and the Board sought to "[e]liminate" the Witness Requirement earlier this year legislatively. The General Assembly affirmatively declined. Yet the Board has attempted to accomplish what it could not do legislatively via an administrative memo.

61.    Numbered Memo 2020-19, together with Number Memo 2020-22, alters the Receipt Deadline in violation of a duly enacted provision of the North Carolina General Statutes. *See* N.C. GEN. STAT. § 163-231(b)(2)(b).

62.     Numbered Memo 2020-19 states that a ballot is not late (1) if it is received by 5:00 p.m. on Election Day or (2) "if postmarked on or before Election Day" and "received by 5 p.m. on Thursday, November 12, 2020." Numbered Memo 2020-19 at 4.

63.     Election Day is November 3, 2020. Under the Receipt Deadline enacted by the General Assembly, a ballot must be received by November 6 at 5:00 p.m.—in other words within three days of Election Day. *See* N.C. GEN. STAT. § 163-231(b)(2)(b).

64.     The Board, through Numbered Memo 2020-19, completely ignores that strict statutory limit and extends the Receipt Deadline to *nine days*—tripling the amount of time for absentee ballots to arrive.

65.     Numbered Memo 2020-22 confirms this change in the Receipt Deadline and the Memo on its face points out that it directly contradicts N.C. GEN. STAT. § 163-231(b)(2)(b). In Footnote 1, the Memo invites the North Carolinian voter to compare the Board's new Receipt Deadline of nine days with the now-made-defunct statutory deadline of "three days after the election." The Board has transparently usurped the authority of the General Assembly by overruling the statutory deadline.

66.     Numbered Memo 2020-19 and Numbered Memo 2020-22 by overruling a clear statutory deadline have transgressed the General Assembly's sole prerogative to regulate federal elections pursuant to the Elections Clause.

67.     Numbered Memo 2020-22 also expands the category of ballots eligible to be counted if received after election day. By statute, such ballots must be "postmarked" by the U.S. Postal Service on or before Election Day. *See* N.C. GEN. STAT. § 163-231(b)(2)(b). Under Numbered Memo 2020-22, however, such ballots may be accepted in certain circumstances if not

14

postmarked by the Postal Service or not sent by through the Postal Service at all but rather by commercial carrier. *See* Numbered Memo 2020-22 at 1–2 (attached hereto as Ex. 1 at 29–30).

68.     Numbered Memo 2020-23 clarifies the procedures for local county officials to confirm that ballots are delivered lawfully. For instance, the Numbered Memo sets out that county officials must confirm with an individual that is dropping off ballots that the individual is either the voter, the voter's near relative, or the voter's legal guardian. But even if the individual is not in one of the three lawful categories of those that can drop off a voter's ballot, the Numbered Memo instructs that "Intake staff shall accept receipt of all ballots provided to them, even if information is missing or someone other than the voter or their near relative or legal guardian returns the ballot." This undermines the General Assembly's criminal prohibition of the unlawful delivery of ballots. N.C. State Bd. of Elections, Numbered Memo 2020-23 at 2 (Sept. 22, 2020), https://bit.ly/333yE3H (attached hereto as Ex. 1 at 39–43).

69.     Moreover, Numbered Memo 2020-23 does nothing to prevent the anonymous and unlawful delivery of votes. After stating that "an absentee ballot may not be left in an unmanned drop box," *i.e.*, a place where county officials are not confirming the identity of the mail deliverer at all, the memorandum plainly discloses the Board's lack of desire to enforce the ban on anonymous deliveries of ballots. To that end, local voting sites that have "a mail drop or drop box used for other purposes . . . must affix a sign stating that voters may not place their ballots in the drop box." "However, a county board may not disapprove a ballot solely because it is placed in a drop box." Thus, Numbered Memo 2020-23 plainly discloses that votes that are illegally placed in a drop box—with only a mere sign saying they should not be so placed—will be counted. This fundamentally undermines the General Assembly's criminal prohibition on the delivery of ballots

15

by those whom it has not authorized, as it provides a clear avenue for ballot harvesters to submit absentee ballots in drop boxes after hours that will nonetheless be counted. *Id.* at 1, 3.

70. Groups supporting Democratic candidates have brought numerous lawsuits challenging the restrictions on ballot harvesting, and thus will be more involved in delivering completed ballots under these Memoranda than groups supporting Republican candidates. *See* Amended Complaint, *N.C. Alliance for Retired Ams.* (Wake Cnty. Super. Ct. Aug. 17, 2020) (attached hereto as Ex. 9); Amended Complaint, *Stringer v. North Carolina*, No. 20-CVS-5615 (Wake Cnty. Super. Ct. July 8, 2020) (attached hereto as Ex. 10); Second Amended Complaint, *Democracy N.C.* (M.D.N.C. June 18, 2020) (attached hereto as Ex. 11); Second Declaration of Tomas Lopez ¶ 2(d), *Democracy N.C.*, ECF No. 73-1 (attached hereto as Ex. 12).

71. Numbered Memo 2020-19, as amended, Numbered Memo 2020-22, and Numbered Memo 2020-23 are each dated September 22, 2020. These modifications thus come well after North Carolina began mailing out absentee ballots on September 4, 2020. *See* Pam Fessler, *Voting Season Begins: North Carolina Mails Out First Ballots*, NPR.ORG (Sept. 4, 2020) https://bit.ly/2Gb2dY2; N.C. GEN. STAT. § 163-227.10. Director Bell has acknowledged that absentee ballots are sent out on a "rolling" basis. As of September 22, 2020 at 4:40 a.m. (several hours before the three Memoranda were announced), 153,664 absentee ballots had *already been cast*. Absentee Data, N.C. STATE BD. OF ELECTIONS (Sept. 22, 2020), *available at* https://bit.ly/33SKzAw. Each and every one of those ballots cast with a different set of rules than those which now apply post-September 22, 2020 with the three Memoranda.

72. Two of the ballots that had already been cast when the September 22, 2020 Memoranda issued were of Plaintiffs Heath and Whitley. Both Plaintiff Heath and Plaintiff Whitley requested their absentee ballots, voted their absentee ballots, and returned their absentee

ballots to their respective County Board of Elections under the statutory rules that existed before Defendants altered those rules on September 22, 2020. This means that both Plaintiffs Heath and Whitley, following the statutory requirement and the instructions on their absentee ballots, obtained a witness over the age of 18 who was not otherwise disqualified to witness their ballot and that they returned that ballot by mail before election day. According to the State Board of Election's website Plaintiff Heath's ballot was validly returned on September 21, 2020 and Plaintiff Whitley's ballot was validly returned on September 17, 2020.

## The Board's Memoranda Injure the Plaintiffs

73.     Implementation of the Board's unconstitutional Memoranda is causing a direct, concrete, and particularized injury to the Legislative Plaintiffs' interest in the validity of the duly-enacted laws of North Carolina and the Legislative Plaintiffs' constitutional prerogative to regulate the federal elections in North Carolina.

74.     The arbitrary issuance of unconstitutional memoranda in the middle of ongoing voting by thousands of North Carolina's is a direct, concrete, and particularized injury to Plaintiffs Heath and Whitley who cast their absentee ballots prior to the release of the Memoranda. Since these Memoranda have arbitrarily changed the requirements for lawful casting of ballots, these Memoranda deprive Plaintiffs Heath and Whitley of the Equal Protection Clause's guarantee of the "nonarbitrary treatment of voters." *Bush*, 531 U.S. at 105–06. And since the Memoranda instruct county boards to accept ballots that would be otherwise unlawful under North Carolina's election statutes, each unlawfully cast vote "dilutes" the weight of Plaintiffs Heath's and Whitley's vote. When it comes to "'dilut[ing] the influence of honest votes in an election,'" whether the dilution is "'in greater or less degree is immaterial;'" it is a violation of the Fourteenth

Amendment. *Anderson v. United States*, 417 U.S. 211, 226–27 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962).

75.     Implementation of the Board's unconstitutional Memoranda are also causing a direct, concrete, and particularized injury to Plaintiff Swain. The Memoranda instruct county boards to accept ballots that would otherwise be unlawful under North Carolina's election statutes, and North Carolina Democrats are requesting and submitting absentee ballots at a higher rate than North Carolina Republicans, thereby injuring Plaintiff Swain by causing his election race to be administered in an unlawful and arbitrary manner. Additionally, groups supporting Democratic candidates will be more involved in filing ballots under these Memoranda (as these groups requested the changes) than groups supporting Republican candidates, further causing the election race to be administered in an unlawful and arbitrary manner.

## CLAIM FOR RELIEF

## COUNT I

**Violation of the Elections Clause (U.S. CONST. art. I, § 4, cl. 1); 42 U.S.C. § 1983**

76.     The facts alleged in the foregoing paragraphs are incorporated by reference.

77.     The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. CONST. art. 1, § 4, cl. 1 (emphasis added).

78.     The Elections Clause requires that state law concerning federal elections be "prescribed in each State by the Legislature thereof." That mandate operates as a limitation on how states may regulate federal elections. *See Colo. Gen. Assembly v. Salazar*, 541 U.S. 1093 (2004) (Rehnquist, C.J., joined by Scalia, J., and Thomas, J., dissenting from denial of certiorari). Whatever the scope of the state courts' authority in other contexts, under the United States

18

Constitution they may not "prescribe[]" "[r]egulations" governing "[t]he Times, Places and Manner of holding Elections for Senators and Representatives."

79.     The Board is *not* the Legislature of North Carolina. The General Assembly is. N.C. CONST. art. II, § 1.

80.     The Board promulgated three Memoranda that are inconsistent with the General Assembly's duly-enacted elections laws.

81.     Numbered Memo 2020-19 allows for absentee ballots without a witness in direct contravention of the General Assembly's duly-enacted Witness Requirement.

82.     Numbered Memo 2020-19 and Numbered Memo 2020-22 establish a nine-day deadline for the receipt of absentee ballots in direct contravention of the General Assembly's duly-enacted three-day Receipt Deadline. Numbered Memo 2020-22 also expands the class of ballots that can be accepted if received after Election Day.

83.     Numbered Memo 2020-23 undermines the General Assembly's criminal prohibition on the delivery of absentee voters by approving the counting of unlawfully delivered ballots.

84.     All three Memoranda thus usurp the General Assembly's sole authority to prescribe the regulations governing federal elections in North Carolina.

85.     The Board has and will continue to act under color of state law to violate the Elections Clause.

86.     Plaintiffs have no adequate remedy at law, and the Memoranda will continue to inflict serious and irreparable harm to the constitutional right to regulate federal elections in North Carolina unless the Board is enjoined from enforcing them.

## COUNT II

**Violation of the Equal Protection Clause (U.S. CONST. amend. XIV, § 1); 42 U.S.C. § 1983**

87. The facts alleged in the foregoing paragraphs are incorporated by reference.

88. The Equal Protection Clause of the Fourteenth Amendment provides that state laws may not "deny to any person within" the state's "jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

89. As relevant here, the Equal Protection Clause protects voters' rights in two ways. First, the Equal Protection Clause ensures that voters may "participate in" elections "on an equal basis with other citizens." *Dunn*, 405 U.S. at 336. To that end, "a State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104–05 (internal citation and quotation marks omitted).

90. The Board issued the three Memoranda after tens of thousands of North Carolinians cast their votes following the requirements set by the General Assembly. This "later arbitrary and disparate treatment" of absentee ballots deprives Plaintiffs Heath and Whitley of the Equal Protection Clause's guarantee because it allows for "varying standards to determine what [i]s a legal vote." *Id.* at 104–105, 107.

91. Second, the Equal Protection Clause ensures voters' rights to have their ballots counted "at full value without dilution or discount." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964). After all, "[o]bviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballot and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted," in turn, means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555 n.29 (quoting *South v. Peters,* 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

20

92.     Both direct denials and practices that otherwise allow for the counting of unlawful ballots dilute the effectiveness of individual votes, thus, can violate the Fourteenth Amendment. *See id.* at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

93.     The Board's Memoranda ensures the counting of votes that are *invalid* under the duly enacted laws of the General Assembly in three ways: (1) by allowing unwitnessed, invalid ballots to be retroactively validated into lawful, compliant ballots, *see* Numbered Memo 2020-19; (2) by allowing absentee ballots to be received up to nine days after Election Day, *see id.*; *see also* Numbered Memo 2020-22; and (3) by allowing for the anonymous delivery of ballots to unmanned boxes at polling sites, *see* Numbered Memo 2020-23.

94.     In addition to allowing illegally cast ballots to count, the practices enabled and allowed by the Memoranda are also open invitations to fraud and ballot harvesting, which will have the direct and immediate effect of diluting the vote of Plaintiffs Heath and Whitley.

95.     The Board has and will continue to act under color of state law to violate the Equal Protection Clause and its guarantees.

96.     Plaintiffs Heath and Whitley have no adequate remedy at law and will suffer serious and irreparable harm to their Constitutional right to equal protection of the laws and to participate in federal elections in North Carolina on an equal basis unless the Board is enjoined from enforcing these Memoranda.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that:

(a)     The Court grant a declaratory judgment under 28 U.S.C. § 2201 that the Numbered Memo 2020-19 is unconstitutional under the Elections Clause and invalid;

(b)     The Court grant a declaratory judgment under 28 U.S.C. § 2201 that the Numbered Memo 2020-22 is unconstitutional the Elections Clause and invalid;

(c)     The Court grant a declaratory judgment under 28 U.S.C. § 2201 that the Numbered Memo 2020-23 is unconstitutional the Elections Clause and invalid;

(d)     The Court grant a declaratory judgment under 28 U.S.C. § 2201 that by issuing Numbered Memo 2020-19, Numbered Memo 2020-22, and Numbered Memo 2020-23, the Board violated the Equal Protection Clause rights of Plaintiffs Heath and Whitley.

(e)     The Court enter a preliminary and a permanent injunction enjoining Defendants from enforcing and distributing Numbered Memo 2020-19 or any similar memoranda or policy statement that does not comply with the requirements of the Elections Clause.

(f)     The Court enter a preliminary and a permanent injunction enjoining Defendants from enforcing and distributing Numbered Memo 2020-22 or any similar memoranda or policy statement that does not comply with the requirements of the Elections Clause.

(g)     The Court enter a preliminary and a permanent injunction enjoining Defendants from enforcing and distributing Numbered Memo 2020-23 or any similar memoranda or policy statement that does not comply with the requirements of the Elections Clause.

(h)     The Court award Plaintiffs their reasonable costs and attorneys' fees under 42 U.S.C. § 1988; and

(i)     The Court grant Plaintiffs such other and further relief as may be just and equitable.


Dated: September 26, 2020                    Respectfully submitted,

                                             /s/Nicole J. Moss
                                             Nicole J. Moss
                                             COOPER & KIRK, PLLC
                                             1523 New Hampshire Ave., N.W.

Washington, D.C. 20036
(202) 220-9600
nmoss@cooperkirk.com

David H. Thompson*
Peter A. Patterson*
Brian W. Barnes*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com
*Notice of Special Appearance pursuant to
Local Rule 83.1(e) forthcoming


Nathan A. Huff, N.C. Bar No. 40626
PHELPS DUNBAR LLP
4140 Parklake Avenue, Suite 100
Raleigh, North Carolina 27612-3723
Telephone: (919) 789-5300
Fax: (919) 789-5301
nathan.huff@phelps.com
Local Civil Rule 83.1 Counsel for Plaintiffs

Attorneys for Plaintiffs