# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION

Civil Action No. 4:20-CV-182

TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives, PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, BOBBY HEATH, MAXINE WHITLEY, and ALAN SWAIN,

        Plaintiffs,

    v.

DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, STELLA ANDERSON, in her official capacity as a member of the North Carolina State Board of Elections, JEFF CARMON, III, in his official capacity as a member of the North Carolina State Board of Elections, and KAREN BRINSON BELL, in her official capacity as the Executive Director of the North Carolina State Board of Elections,

        Defendants.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

### INTRODUCTION

Plaintiffs respectfully request that this Court enter a temporary restraining order to enjoin an unprecedented effort by the State Board of Elections to usurp the General Assembly's prerogative to regulate federal elections in North Carolina. Disregarding the clear mandate of the U.S. Constitution that provides that only the "Legislature[s]" of the several states or Congress may prescribe the time, place, and manner of federal elections, the Board, through its Executive

Director Karen Brinson Bell, issued three Memoranda directly contravening the General Assembly's duly-enacted statutes. Ignoring the fact that the Board is neither the North Carolina Legislature nor Congress, the Board proceeded to negotiate with private parties and issue these Memoranda to gut several important election rules. Further, these ad-hoc Memoranda have been issued while voting is *ongoing* and to that end the Board is applying different rules to ballots cast by similarly situated voters thus violating the Equal Protection Clause in two distinct ways: this new regime results in arbitrary distinctions based solely on whether a ballot was cast before or after the Memoranda were adopted; and the new rules allow illegally cast votes to be counted thereby diluting the vote of those who cast their ballots lawfully. For the reasons set forth below and in light of the ongoing election, Plaintiffs are entitled to a temporary restraining order.

## STATEMENT OF FACTS

As North Carolina's "Legislature," the General Assembly is tasked with regulating federal elections in North Carolina. U.S. CONST. art. 1, § 4, cl. 1. Accordingly, the General Assembly has exercised its federal constitutional authority to establish rules governing the manner of federal elections in North Carolina and provided many options for North Carolinians to exercise their right to vote. For instance, voters have three main options for casting their ballots. Voters may vote in person on Election Day, they may vote in person during the 17-day early voting, or they may vote absentee by mail.

Voters do not need any special circumstance or reason to vote absentee in North Carolina. To return completed absentee ballots, a voter must have them witnessed and then must mail or deliver them through a delivery service such as UPS or in person. In addition, the voter's near relative or verifiable legal guardian can also return the ballots in person. N.C. GEN. STAT. § 163-231. But other than the voter's near relative or verifiable legal guardian, the General Assembly has

criminally prohibited any other person from "return[ing] to a county board of elections the absentee ballot of any voter." N.C. Gen. Stat. § 163-226.3(a)(5).

The General Assembly also enacted strict requirements for the return of absentee ballots. Generally speaking, absentee ballots must be received by the appropriate local county board of elections either: (a) no later than 5:00pm on Election Day; or (b) if postmarked by Election Day, "no later than three days after the election by 5:00 p.m." N.C. Gen Stat. § 163.231(b)(2)(b). This is referred to as the Receipt Deadline.

In response to the COVID-19 pandemic, North Carolina elections officials sought the power to adjust the State's voting laws to account for the pandemic. To that end, North Carolina State Board of Elections Executive Director Karen Brinson Bell and the Board attempted to assert emergency powers to change the election laws for the 2020 election pursuant to statutory authority to respond to a "natural disaster." N.C. Gen. Stat. § 163-27.1. But the North Carolina Rules Review Commission unanimously rejected this attempted power grab—by a vote of 9–0, *see* Rules Review Commission Meeting Minutes at 4 (May 21, 2020), https://bit.ly/3kLAY5y (Compl. Ex. 8). In declining to approve the changes to the rule, the Rules Review Commission explained that the Board "does not have the authority to expand the definition of 'natural disaster' as proposed" in the amendments. *Id.*

Director Bell also wrote a letter to Governor Cooper and to legislative leaders recommending several "statutory changes" on March 26, 2020. N.C. State Board of Elections, *Recommendations to Address Election-Related Issues Affected by COVID-19* at 3 (March 26, 2020), https://bit.ly/369EBOO (Compl. Ex. 4). In her letter, Director Bell requested that, among other things, the General Assembly "[r]educe or eliminate the witness requirement." She explained

that such action was recommended to "prevent the spread of COVID-19." And she further argued that "[e]liminating the witness requirement altogether is another option."

On June 11, 2020, the General Assembly passed bipartisan legislation adjusting the voting rules for the November Election by an overwhelming 142-26 margin. *See* Bipartisan Elections Act of 2020, 2020 N.C. Sess. Laws 2020-17. Governor Cooper signed the duly passed bill into law the next day. The Act made a number of adjustments to North Carolina's election laws, including some—but not all—of what Director Bell requested.

Unlike Director Bell's suggestion to "[e]liminate" the Witness Requirement, the General Assembly modified the requirement. Normally under North Carolina law, absentee ballots require two qualified witnesses. *See* N.C. GEN. STAT. § 163-231. But for the 2020 Election, the Bipartisan Elections Act provides that an "absentee ballot shall be accepted and processed accordingly by the county board of elections if the voter marked the ballot in the presence of *at least one person* who is at least 18 years of age and is not disqualified by G.S. 163–226.3(a)(4) or G.S. 163–237(c)." *See* Bipartisan Elections Act of 2020, 2020 N.C. Sess. Laws 2020-17 § 1.(a) (emphasis added). The one absentee ballot witness is still required to sign "the application and certificate as a witness" and print his or her "name and address" on the absentee ballot's return envelope.

And while the Bipartisan Elections Act changed numerous other provisions to account for the pandemic, it did not change the Receipt Deadline for absentee ballots, which remains set by statute as three days after the election by 5:00pm for ballots delivered by the U.S. Postal Service. The Bipartisan Elections Act also did not alter the prohibition on "any person" other than a near relative or verifiable legal guardian "tak[ing] into that person's possession for delivery to a voter or for return to a county board of elections the absentee ballot of any voter." N.C. GEN. STAT. § 163-226.3(a)(5). This remains clearly illegal as a matter of North Carolina law.

On August 10, 2020, nearly two months after the General Assembly's enactment of the Bipartisan Elections Act, the North Carolina Alliance for Retired Americans, a social welfare organization comprised of retirees from public and private unions, community organizations, and individual activists, together with seven individual North Carolina voters filed suit in the Wake County Superior Court. *See North Carolina Alliance for Retired Americans, et al. v. North Carolina State Board of Elections* ("*Alliance*"), No. 20-CVS-8881 (Wake Cnty. Super. Ct.).

The *Alliance* plaintiffs named as a defendant one of the named Defendants in this action, Board Chair, Damon Circosta. The *Alliance* plaintiffs sought injunctive relief, seeking numerous alterations to North Carolina's election statutes. Among their requested remedies, the *Alliance* plaintiffs asked the court to "[s]uspend the Witness Requirement for single-person or single-adult households" and to "[r]equire election officials to count all absentee ballots mailed through USPS and put in the mail by Election Day if received by county boards up to nine days after Election Day." The *Alliance* plaintiffs also sought to "[p]reliminarily and temporarily enjoin the enforcement of the" criminal prohibition on delivering another voter's absentee ballot.

Legislative Plaintiffs Moore and Berger intervened as of right to defend the duly-enacted election regulations. In fact, both the federal district court for the Middle District of North Carolina and a North Carolina state court heard and rejected recent motions to preliminarily enjoin the Witness Requirement because the plaintiffs in those cases failed to show a likelihood of success on the merits. *See* Order on Injunctive Relief, *Chambers v. State*, No. 20 CVS 500124, at 6–7 (N.C. Super. Ct. Sept. 3, 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, No. 20-cv-457, 2020 WL 4484063, at *36 (M.D.N.C. Aug. 4, 2020).

But before the state court had an opportunity to rule on the motion for a preliminary injunction in the *Alliance* case, the Board and the *Alliance* plaintiffs agreed to a proposed consent

judgment. Plaintiffs' and Executive Defendants' Joint Motion for Entry of a Consent Judgment, *Alliance*, No. 20-CVS-8881 (Sept. 22, 2020 Wake Cnty. Super. Ct.) (Compl. Ex. 1). The Board made this agreement despite the fact that "a lot of the concessions" in the consent judgment had been previously rejected by the federal and state court hearing similar claims. *See* Ken Raymond Resignation Letter (Sept. 23, 2020) (Compl. Ex. 7); *see also* David Black Resignation Letter (Sept. 23, 2020) (Compl. Ex. 6). Lawyers in the North Carolina Attorney General's office allegedly did not apprise Board members of this fact, prompting two Board members to resign. *See id.*

The Board released three Numbered Memoranda, at the same time as announcing the consent judgment.[1] Each memorandum purports to nullify validly enacted statutes passed by the General Assembly pursuant to its exclusive federal constitutional prerogative to regulate the time, place, and manner for holding federal elections. Numbered Memo 2020-19 "directs the procedure county boards must use to address deficiencies in absentee ballots." Originally released August 21, 2020, the Board revised it on September 22, 2020 to allow voters to cure deficiencies in the Witness Requirement mandated by Section 1.(a) of the Bipartisan Elections Act. (Compl. Ex. 1 at 32–37; original attached as Compl. Ex. 3). If a "witness . . . did not print name," "did not print address," "did not sign," or "signed on the wrong line," the Board will allow the absentee voter to "cure" the deficiency. A voter cures a Witness Requirement deficiency through a "certification."

The Board's "certification" is simply a form sent to the voter by the county board. And the voter can return the form to the county board at any time until 5 p.m., November 12, 2020, and

---

[1] Numbered Memo 2020-19 is available on the Board's Numbered Memo page. *See* https://bit.ly/367Ffw8 (last accessed Sept. 26, 2020). But Numbered Memos 2020-22 and 2020-23 for some reason are not available. These Memoranda are dated September 22, 2020 and are publicly available through a link to the Board's joint motion in the Board's press release announcing the motion. *See* https://bit.ly/2S5qBNr; *see also* N.C. State Bd. of Elections, State Board Updates Cure Process to Ensure More Lawful Votes Count (Sept. 22, 2020) (Compl. Ex. 2). Numbered Memo 2020-19 also cross references Numbered Memo 2020-22. *See* Numbered Memo 2020-19 at 4.

may do so via fax, email, in person, or by mail or commercial carrier. For a missing witness, the "certification" does not require the voter to resubmit a ballot in accordance with the Witness Requirement mandated by Section 1.(a) of the Bipartisan Elections Act. Instead, the "certification" eliminates the Witness Requirement altogether. All a voter must do is sign and affirm the following affidavit:

> I am submitting this affidavit to correct a problem with missing information on the ballot envelope. I am an eligible voter in this election and registered to vote in [name] County, North Carolina. I solemnly swear or affirm that I voted and returned my absentee ballot for the November 3, 2020 general election and that I have not voted and will not vote more than one ballot in this election. I understand that fraudulently or falsely completing this affidavit is a Class I felony under Chapter 163 of the North Carolina General Statutes.

Thus, the Board through Memorandum 2020-19's "certification" allows absentee voters to be their own witnesses, a step that effectively vitiates the Witness Requirement. This is directly contrary to clear text of the Bipartisan Elections Act that requires at least one witness for every absentee ballot. Notably, in federal litigation challenging the Witness Requirement, Executive Director Bell testified under oath that an absentee ballot with "no witness signature" could not be cured and therefore elections officials would have to "spoil that particular ballot" and require the voter to vote a new one. Evidentiary Hearing Tr. at 122, *Democracy N.C. v. N.C. State Bd. of Elections*, No. 20-cv-457 (M.D.N.C. July 21, 2020) (Compl. Ex. 5). This understanding is also reflected in the original version of Numbered Memo 2020-19, which required ballots with missing witness information to be spoiled because such "deficiencies cannot be cured by affidavit, because the missing information comes from someone other than the voter." Original Numbered Memo 2020-19 at 2.

Numbered Memo 2020-19, together with Numbered Memo 2020-22, alters the Receipt Deadline in violation of a duly enacted provision of the North Carolina General Statutes. *See* N.C.

GEN. STAT. § 163-231(b)(2)(b). Numbered Memo 2020-19, cross-referencing Numbered Memo 2020-22, states that a ballot is not late (1) if it is received by 5 p.m. on Election Day or (2) "if postmarked on or before Election Day" and "received by 5 p.m. on Thursday, November 12, 2020." Election Day is November 3, 2020. Under the Receipt Deadline enacted by the General Assembly, a ballot must be received by November 6 at 5:00pm—in other words, within three days of Election Day. *See* N.C. GEN. STAT. § 163-231(b)(2)(b). The Board, through Numbered Memos 2020-19 and 2020-22, completely ignores that strict statutory limit and extends the Receipt Deadline to *nine days*—tripling the amount of time for absentee ballots to arrive after Election Day. Numbered Memo 2020-22 also expands the category of ballots that may be counted if received after Election Day. (Compl. Ex. 1 at 29–30). Under state law, only ballots sent through U.S. Postal Service and "postmarked" by Election Day may be counted if received after Election Day. Numbered Memo 2020-22, however, in certain circumstances allows ballots sent through the U.S. Postal Service without a postmark or sent by commercial carrier to be counted if received after Election Day. *See* Numbered Memo 2020-22 at 1–2.

Numbered Memo 2020-23 undermines the General Assembly's criminal prohibition on the delivery of an absentee ballot by individuals other than the voter himself or the voter's near relative or legal guardian. (Compl. Ex. 1 at 39–43). The General Assembly has provided that it shall be unlawful for any person—other than the voter, the voter's near relative, or legal guardian—"to take into that person's possession for delivery to a voter or for return to a county board of elections the absentee ballot of any voter." N.C. GEN. STAT. § 163-226.3(a)(5). And Numbered Memo 2020-23 purports to clarify the procedures for local county officials to confirm that ballots are delivered lawfully. For instance, the Numbered Memo sets out that county officials must confirm with individuals that are dropping off ballots that the individual is the voter, the voter's near relative,

or the voter's legal guardian. But even if the individual does not fall into one of the three lawful categories of people who can drop off a voter's ballot, the Numbered Memo instructs that "[i]ntake staff shall accept receipt of all ballots provided to them, even if information is missing or someone other than the voter or their near relative or legal guardian returns the ballot." This directly undermines the General Assembly's criminal prohibition on the unlawful delivery of ballots. *See* N.C. GEN. STAT. § 163-226.3.

Moreover, Numbered Memo 2020-23 does nothing to prevent the anonymous and unlawful delivery of votes. After stating that "an absentee ballot may not be left in an unmanned drop box," *i.e.*, a place where county officials are not confirming the identity of the mail deliverer at all, the memorandum plainly discloses the Board's lack of desire to enforce the ban on anonymous deliveries of ballots. To that end, local voting sites that have "a mail drop or drop box used for other purposes . . . must affix a sign stating that voters may not place their ballots in the drop box." "However, a county board may not disapprove a ballot solely because it is placed in a drop box." Thus, Numbered Memo 2020-23 plainly discloses that votes that are illegally placed in a drop box—with only a mere sign saying they should not be so placed—will be counted. This fundamentally undermines the General Assembly's criminal prohibition on the delivery of ballots by those whom it has not authorized.

Numbered Memo 2020-19, Numbered Memo 2020-22, and Numbered Memo 2020-23 are all dated September 22, 2020. These modifications thus come well after North Carolina began mailing out absentee ballots on September 4, 2020. *See* Pam Fessler, "Voting Season Begins: North Carolina Mails Out First Ballots," npr.org (Sept. 4, 2020), https://bit.ly/2Gb2dY2. As of September 22, 2020 at 4:40am (several hours before the three Memoranda were announced), 153,664 absentee ballots had *already been cast*. Absentee Data, North Carolina State Board of

Elections (Sept. 22, 2020), *available at* https://bit.ly/2G3stnJ. Each and every one of those ballots were cast with a different set of rules than those which now apply post-September 22, 2020 with the three Memoranda.

In response to the Board's actions, the Plaintiffs seek declaratory and injunctive relief.

## STANDARD OF REVIEW

"The substantive standard for granting either a temporary restraining order or a preliminary injunction is the same." *Patel v. Moran*, 897 F. Supp. 2d 389, 395 (E.D.N.C. 2012). To obtain either, a party must establish: "(1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Id.*; FED. R. CIV. P. 65(b).

## ARGUMENT

Legislative Plaintiffs sue in their official capacity as Speaker of the House and President Pro Tempore of the Senate. As such, under North Carolina law, they represent *both* the institutional interests of the General Assembly *and* the interests of the State as a whole in this litigation. *See* N.C. GEN. STAT. §§ 1-72.2, 120-32.6. The Defendants' actions undermine North Carolina's election statutes and effectively nullify statutes enacted by the General Assembly while depriving the State of its ability to "enforce its duly enacted" laws. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). Plaintiff Alan Swain is currently running as the Republican candidate for Congress in North Carolina's Second Congressional District. The Defendants' Memoranda unconstitutionally change the rules governing the ongoing voting in his federal election.

Plaintiffs Bobby Heath and Maxine Whitley are both eligible, registered voters who reside in North Carolina. Both Plaintiff Heath and Plaintiff Whitley, following the existing statutory requirements, requested and received absentee ballots. Both Plaintiff Heath and Plaintiff Whitley,

following the requirements in place before Defendants issued the Numbered Memos being challenged here, obtained a qualified witness and had that individual witness them voting their absentee ballot. Both Plaintiff Heath and Plaintiff Whitley, after obtaining the required witness signature on their ballots, returned their ballots by mail to their respective County Boards of Election and had those ballots received by their County Board of Election prior to September 22, 2020.

## I. __Plaintiffs Are Likely To Succeed on the Merits__

The Defendants' actions in publishing the three Memoranda violate two provisions of the Constitution that protect our elections and the right to vote: the Elections Clause and the Equal Protection Clause.

### A. __The Defendants' Memoranda Violate the Elections Clause__

The text of the Elections Clause is clear: "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators." (emphasis added). U.S. CONST. art. 1, § 4, cl. 1. Accordingly, there are only two entities that may constitutionally regulate federal elections: Congress and the state "Legislature." Since neither Congress nor the General Assembly promulgated the Board's Memoranda, these Memoranda are unconstitutional to the extent they overrule the enactments of the General Assembly or otherwise qualify as "Regulations" for the times, places, and manner of holding the upcoming federal election.

The General Assembly is the "Legislature," established by the people of North Carolina. N.C. CONST. art. II, § 1. And the North Carolina Constitution affirmatively states that the grant of legislative power to the General Assembly is exclusive—"[t]he legislative, executive, and supreme

judicial powers of the State government shall be forever separate and distinct from each other."

N.C. CONST. art. I, § 6; *see also State v. Berger*, 781 S.E.2d 248, 250 (N.C. 2016). With this grant

of exclusive legislative power, the General Assembly is vested with the authority to "enact[] laws

that protect or promote the health, morals, order, safety, and general welfare of" the state. *Id*.

Concurrently, this exclusive grant of legislative power means the U.S. Constitution has assigned

the role of regulating federal elections in North Carolina to the General Assembly.

The word "Legislature" in the Elections Clause was "not . . . of uncertain meaning when

incorporated into the Constitution." *Hawke v. Smith*, 253 U.S. 221, 227 (1920). And "the

Legislature" means now what it meant then, "the representative body which ma[kes] the laws of

the people." *Id.*; *see e.g.,* Federalist No. 27, at 174–175 (C. Rossiter ed. 1961) (Alexander

Hamilton) (defining "the State legislatures" as "select bodies of men"); "Legislature," American

Dictionary of the English Language (1828) (Noah Webster) ("[T]he body of men in a state or

kingdom, invested with power to make and repeal laws."); "Legislature," A Dictionary of the

English Language (1755) (Samuel Johnson) ("The power that makes laws."). By choosing to use

the word "Legislature," the Elections Clause makes clear that the Constitution does not grant the

power to regulate elections to states as a *whole*, but only to the state's legislative branch, *Ariz.

State Legislature v. Ariz. Indep. Redist. Comm'n*, 576 U.S. 787, 814 (2015), and in North Carolina

that is the General Assembly.

The Framers had a number of reasons to delegate (subject to Congress's supervisory

power) the task of regulating federal elections to state Legislatures like the General Assembly.

Specifically, the Framers understood the regulation of federal elections to be an inherently

legislative act. After all, regulating elections "involves lawmaking in its essential features and most

important aspect." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *cf. Ariz. Indep. Redist. Comm'n*, 576

U.S. at 808 (observing that "redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking"). And so, as one participant in the Massachusetts debate on the ratification of the Constitution explained, "[t]he power . . . to regulate the elections of our federal representatives must be lodged somewhere," and there were "but two bodies wherein it can be lodged—the legislatures of the several states, and the general Congress." M. Farrand, *The Records of the Federal Convention of 1787, vol. 2* (1911), *available at* https://bit.ly/3kPvZRu.

Further, the Framers were aware of the possibility that regulations governing federal elections could be ill-designed. James Madison, for instance, acknowledged that those with power to regulate federal elections could "take care so to mould their regulations as to favor the candidates they wished to succeed." *Id.* But as with so many other problems the Framers confronted, their solution was structural and democratic. To ensure appropriate regulation of federal elections, the Elections Clause gives responsibility to the most democratic branch of state government—the Legislature—so that the people may check any abuses at the ballot box. And as a further check, the Elections Clause gives supervisory authority to the most democratic branch of the federal government—the U.S. Congress.

The text and history of the Elections Clause thus confirm that the General Assembly is the only constitutionally empowered state entity to regulate federal elections. And as the Supreme Court has explained with respect to the Presidential Electors Clause—the closely analogous provision of Article II, Section 1 that empowers state legislatures to select the method for choosing electors to the Electoral College—the state legislatures' power to prescribe regulations for federal elections "cannot be taken from them or modified by their state constitutions." *McPherson v. Blacker*, 146 U.S. 1, 35 (1892). And courts have long recognized this limitation on the power of states to restrain the discretion of state legislatures under the Elections Clause and the Presidential

Case 4:20-cv-00182-D   Document 9   Filed 09/26/20   Page 13 of 26

Electors Clause. *See, e.g.*, *State ex rel. Beeson v. Marsh*, 34 N.W. 2d 279, 286–87 (Neb. 1948); *Com. ex rel. Dummit v. O'Connell*, 181 S.W. 2d 691, 695 (Ky. Ct. App. 1944); *In re Plurality Elections*, 8 A. 881, 882 (R.I. 1887); *In re Opinion of Justices*, 45 N.H. 595, 601 (1864).

The Board has clearly violated the Elections Clause by issuing Memoranda that purport to adjust the rules of the election that have already been set by statute. First, the Board has no freestanding power under the Constitution to rewrite North Carolina's elections laws and to "prescribe[ ]" the Board's own preferred "[r]egulations." U.S. CONST. art. I, § 4, cl. 1. The exclusive home of the legislative branch in North Carolina is the General Assembly. Thus, the Board is not the "Legislature" empowered to adjust the rules of the federal election on its own.

Second, the Board has not been delegated the General Assembly's constitutional authority, so this case is far afield from *Arizona Independent Redistricting Commission*. In that case, the Supreme Court dealt with a provision of the Arizona Constitution—adopted through popular initiative—that vested an independent state commission with authority over drawing federal congressional districts. The state legislature claimed that the federal Elections Clause rendered that allocation of authority invalid, but the Supreme Court disagreed, concluding that the independent state commission simply acted as "a coordinate source of legislation on equal footing with the representative legislative body." *Arizona Indep. Redist. Comm'n*, 576 U.S. at 795. But here the Board has no legislative power and is not on equal footing with the General Assembly. Indeed, the North Carolina Supreme Court expressly held that a prior version of the Board "clearly performs primarily executive, rather than legislative or judicial, functions." *Cooper v. Berger*, 809 S.E.2d 98, 112 (N.C. 2018). It therefore struck down provisions limiting the Governor's control over the Board. The current version of the statute does not change the nature of the Board's activities but

rather addresses the constitutional infirmities recognized by *Cooper v. Berger*. *Compare id.* at 114, with N.C. GEN. STAT. § 163-19.

Furthermore, the Board is merely a creature of statute. *See* N.C. GEN STAT. § 163-19(a) ("There is established the State Board of Elections, which may be referred to as the "State Board" in this Chapter."). And consistent with being a creature of statute, the Board is limited by the statute that created it. "The State Board of Elections shall have general supervision over the primaries and elections in the State, and it shall have authority to make such reasonable rules and regulations . . . as it may deem advisable *so long as they do not conflict* with any provisions of this Chapter." *See* N.C. GEN. STAT. § 163-22(a) (emphasis added). Thus, the General Assembly has not granted the Board any power to overrule the duly enacted statutes governing elections or given it any form of legislative power. Quite the contrary, the Board is not allowed to issue any rules or regulations that "conflict" with provisions enacted by the General Assembly.

The Board's own actions confirm this. In particular, Executive Director Bell asked the General Assembly to eliminate the Witness Requirement. If the Board had the power to abolish that requirement unilaterally, why would the Board seek a legislative fix instead? The Board further sought to expand its emergency powers through regulation, but this effort too was rejected. If the Board had the power to overrule the General Assembly's statutes through its existing authorities, then why did it seek to amend its regulations in this way? The answer to both questions is the same—the Board does not have the power to amend or nullify the General Assembly's statutes regulating the federal election.

The Constitution delegated to a single North Carolina entity the power to regulate federal elections: the General Assembly. And the General Assembly has not further delegated the power to enable the Board to amend or nullify its duly-enacted statutes. Thus, because the Numbered

Memoranda purport to alter the time, place, and manner for holding the upcoming federal election in a manner that contravenes the General Assembly's duly enacted statutes, these Memoranda violate the Elections Clause.

### B. The Defendants' Ad-hoc Memoranda Violate the Equal Protection Clause

State election laws may not "deny to any person within" the state's "jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The Constitution thus ensures "the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted . . . ." *United States v. Classic*, 313 U.S. 299, 315 (1941). But the right to vote includes the right to have one's ballot counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555 n.29 (internal quotation marks omitted).

To ensure equal weight is afforded to all votes, the Equal Protection Clause further requires states to "avoid arbitrary and disparate treatment of the members of its electorate." *Bush v. Gore*, 531 U.S. 98, 105 (2000)); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Gray v. Sanders*, 372 U.S. 368, 380 (1963) ("The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of [the Supreme Court's] decisions."). "[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros v. Bd. of Elections*, 249 F.3d 941, 954 (9th Cir. 2001).

At a minimum then, the Equal Protection Clause requires the "nonarbitrary treatment of voters" and forbids voting practices that are "standardless," without "specific rules designed to

ensure uniform treatment." *Bush*, 531 U.S. at 103, 105–06; *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477–78 (6th Cir. 2008). Consequently, the "formulation of uniform rules" is "necessary" because the "want of" such rules may lead to "unequal evaluation of ballots." *Bush*, 531 U.S. at 106.

Defendants have violated these constitutional requirements, thereby infringing upon Plaintiff Heath's and Plaintiff Whitley's rights under the Equal Protection Clause to (1) "participate in" the upcoming election "on an equal basis with other citizens in" North Carolina. *Dunn*, 405 U.S. at 336, and (2) have their ballots counted "at full value without dilution or discount," *Reynolds*, 377 U.S. at 555 n.29.

First, if the Memoranda are not enjoined, North Carolina will be administering its election in an arbitrary fashion pursuant to nonuniform rules that will result in the unequal evaluation of ballots. As discussed above, North Carolina law requires all absentee ballots to be witnessed by one qualifying adult. *See* Bipartisan Elections Act of 2020, 2020 N.C. Sess. Laws 2020-17, § 1.(a). North Carolina also prohibits any person other than a voter's "near relative" or "verifiable legal guardian" from delivering a completed absentee ballot to a county board of elections. N.C. GEN. STAT. § 163-226.3(a)(5). North Carolina also requires absentee ballots to be received, at the latest, by 5 p.m. three days after Election Day. These provisions governed the absentee ballot submission process for the 153,664 voters who had already cast their absentee ballots before the Memoranda were announced like Plaintiffs Heath and Whitley. Similarly, these provisions had governed the nearly 950,000 voters who had requested absentee ballots prior to the Board's memoranda. The Board's new Numbered Memo 2020-19 is thus a sudden about-face on the Witness Requirement that upends the careful bipartisan framework that has governed voting so far.

The Defendants' Memoranda not only effectively nullified the Witness Requirement and Ballot Harvesting Ban, *see supra* I.A., but the Board has also been plainly inconsistent in its requirements. On August 21, 2020, the Board explained in Numbered Memo 2020-19 that a failure to comply with the Witness Requirement was a deficiency that *could not* be cured by a post-submission affidavit. *See* N.C. State Bd. of Elections, Numbered Memo 2020-19 at 2 (Aug. 21, 2020). Instead, the relevant county board of elections was required to spoil the ballot and reissue a new ballot along with an explanatory notice to the voter. *Id.* The lack of a witness was a problem that no affidavit could cure. *Id.*

The Defendants then arbitrarily changed course. The Defendants issued the updated Numbered Memo 2020-19 on September 22, 2020. The new memo explains that an absentee ballot entirely devoid of witness information may be cured with a certification from the voter. See N.C. State Bd. of Elections, Numbered Memo 2020-19 at 2–4 (Sept. 22, 2020), https://bit.ly/3666pTV (explaining that deficiencies curable by a certification from the voter include a witness or assistant failing to write their name, address, or signature). This absentee "certification" will transmogrify an entirely unwitnessed (and hence invalid) ballot into a lawful, compliant ballot. All the Board's Numbered Memo requires is that the voter merely affirm that the voter "voted and returned [her] absentee ballot for the November 3, 2020 general election and that [she] ha[s] not voted and will not vote more than one ballot in this election." Plaintiffs' and Executive Defendants' Joint Motion for Entry of a Consent Judgment Ex. B, *N.C. Alliance for Retired Ams. v. N.C. State Bd. of Elections*, No. 20-CVS-8881 (N.C. Super. Ct. Sept. 22, 2020) (Compl. Ex. 1 at 37). The certification does not require voters to affirm that they had their ballots witnessed in the first place or even attempted to follow this important aspect of the law.

And Numbered Memo 2020-19, in conjunction with Numbered Memo 2020-22, goes further by allowing absentee ballots to be received up to *nine days* after Election Day. This is both in violation of the General Assembly's enacted statutes but also a further change in the rules while voting is ongoing. And Numbered Memo 2020-23 further provides a standardless approach by allowing even the anonymous delivery of ballots—plainly contrary to N.C. GEN. STAT. § 163-226.3's prohibition on the delivery of ballots by all but a select few—to unmanned boxes at polling sites.

Accordingly, if these Memoranda are not enjoined, North Carolina will necessarily be administering its election in an arbitrary fashion pursuant to nonuniform rules that will result in the unequal evaluation of ballots. See *Bush*, 531 U.S. at 106. Over 150,000 voters cast their ballots before issuance of the Memoranda, and therefore worked to comply with the Witness Requirement and lawful delivery requirements. There is no justification for subjecting North Carolina's electorate to this arbitrary and disparate treatment, especially given that both a North Carolina federal court and a North Carolina state court have rejected motions to preliminarily enjoin the witness requirement, finding that plaintiffs in those cases had not shown a likelihood of success on the merits. See Order on Injunctive Relief, *Chambers v. State*, No. 20 CVS 500124, at 6–7 (N.C. Super. Ct. Sept. 3, 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, No. 20-cv-457, 2020 WL 4484063, at *36 (M.D.N.C. Aug. 4, 2020). For the Board to suddenly reverse course despite this demonstrated success in court raises questions as to the rationale underlying a sudden change in policy in the midst of an ongoing election. [2]

---

[2] Even if the state court *had* preliminarily enjoined the witness requirement, finding a likelihood of success on the merits, the fact would remain that the state court lacks authority to alter the election laws. *See supra* Part I.A. The Elections Clause of the U.S. Constitution assigns the role of regulating federal elections in North Carolina exclusively to the General Assembly, not the state courts. *See* U.S. CONST. art. I, § 4, cl. 1.

19

Second, if the Memoranda are not enjoined, the Board will be violating Plaintiffs Heath's and Whitley's rights to have their ballots counted without dilution. *Reynolds*, 377 U.S. at 555 n. 29. The Board's Memoranda ensure that votes that are invalid under the duly enacted laws of the General Assembly *will* be counted in three ways: (1) by allowing unwitnessed, invalid ballots to be retroactively validated into lawful, compliant ballots, *see* Numbered Memo 2020-19; (2) by allowing absentee ballots to be received up to nine days after Election Day, *see id.*; *see also* Numbered Memo 2020-22; and (3) by allowing for the anonymous delivery of ballots to unmanned boxes at polling sites, *see* Numbered Memo 2020-23. These changes are open invitations to fraud and ballot harvesting, which will have the direct and immediate effect of diluting the vote of Plaintiffs Heath and Whitley.

The Board's Memoranda are a denial of the one-person, one-vote principle affixed in the Supreme Court's jurisprudence. Dilution of lawful votes, to any degree, by the casting of unlawful votes violates the right to vote. *Reynolds*, 377 U.S. at 555; *Anderson*, 417 U.S. at 226–27; *Baker v. Carr*, 369 U.S. 186, 208 (1962). Moreover, those practices, such as the Board's that promote fraud and dilute the effectiveness of individual votes by allowing illegal votes, violate the Fourteenth Amendment too. *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."). Thus, when the Board purposely accepts even a single ballot without the required witness, accepts otherwise late ballots beyond the deadline set by the General Assembly, or facilitates the delivery of ballots by unlawful parties, the Board has accepted votes that dilute the weight of lawful voters like Plaintiffs Heath and Whitley.

Accordingly, the Board is not only administering the election in an arbitrary and nonuniform manner that will inhibit Plaintiffs Heath's and Whitley's right "to participate in" the

election "on an equal basis with other citizens in" North Carolina, *Dunn*, 405 U.S. at 336, but it is also purposefully allowing otherwise unlawful votes to be counted, thereby deliberately diluting and debasing Plaintiffs Heath's and Whitley's lawful votes. These are clear violations of Plaintiffs Heath's and Whitley's Equal Protection rights under the Fourteenth Amendment.

## II.     The Irreparable Harm to Plaintiffs Warrants a Temporary Restraining Order

Plaintiffs have demonstrated that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Board's *ongoing* implementation of the Memoranda has the immediate and irreparable effect of nullifying North Carolina election statutes during the very election those statutes were enacted to regulate. And the *ongoing* implementation undermines Plaintiffs Heath's and Whitley's right to vote on an equal basis right now as individuals are casting votes under the updated Memoranda now.

*First*, the ongoing nullification of duly-enacted North Carolina laws governing this election is *per se* irreparable. "The inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *see also New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). The Board's actions are a serious affront to those "statutes enacted by representatives of its people," and thus can only be remedied by immediate injunctive relief. *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers); *see also Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020).

*Second*, Plaintiffs Heath's and Whitley's right to the Equal Protection of their right to vote cannot be remedied by damages and therefore constitutes irreparable harm. *See NAACP-Greensboro Branch v. Guilford Cty. Bd. of Elections*, 858 F. Supp. 2d 516, 526 (M.D.N.C. 2012) (citing *A Helping Hand, LLC v. Baltimore Cnty.*, 355 Fed. App'x 773, 776–77 (4th Cir. 2009));

*see also Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction."). Their harm is all the more irreparable as voting is ongoing, thus the Board's arbitrary and standardless treatment of ballots—to the detriment of lawful voters like Plaintiffs Heath and Whitley—only gets worse and harder to remedy as more ballots are accepted under the new Memoranda.

## III.     The Public Interest and Lack of Harm to Defendants Warrant a Temporary Restraining Order

The balance of equities and public interest weigh strongly in favor of granting a temporary restraining order. Plaintiffs stand to suffer immediate, irreparable harm, including injuries to the General Assembly's prerogative to regulate the federal election, Plaintiff Swain's ongoing election, and Plaintiffs Heath's and Whitley's right to have their vote treated equally. And "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). Moreover, the Board's decision to issue the Memoranda, changing the rules of balloting midstream, undermines public confidence in this election. And to the extent the Memoranda are unconstitutional, voters are being told inaccurate information right now about how to lawfully cast a ballot in North Carolina. Thus, these Memoranda introduce additional confusion and uncertainty into an election where citizens are already concerned about election security. Since "public confidence in the integrity of the electoral process has independent significance," the public interest would be further served here. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008). By contrast, the Board can "in no way [be] harmed by issuance of a" temporary restraining order "which prevents the [Board] from enforcing [Memoranda] likely to be found unconstitutional. If anything, the system is improved by such" an order. *Giovani Carandola*, 303 F.3d at 521.

## IV.    The Court Should Waive the Bond Requirement or Set Bond at a Nominal Amount

While Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," it is well established "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement," *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). Here, Defendants will not suffer costs and damages from the proposed restraining order, so Plaintiffs should not be required to post security, or should be required to post only a nominal amount.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a temporary restraining order:

(1) Enjoining Defendants from enforcing and distributing Numbered Memo 2020-19 or any similar memoranda or policy statement that does not comply with the requirements of the Elections Clause.

(2) Enjoining Defendants from enforcing and distributing Numbered Memo 2020-22 or any similar memoranda or policy statement that does not comply with the requirements of the Elections Clause.

(3) Enjoining Defendants from enforcing and distributing Numbered Memo 2020-23 or any similar memoranda or policy statement that does not comply with the requirements of the Elections Clause

(4) Enjoining Defendants from enforcing and distributing the three Numbered Memoranda or any similar memoranda or policy statement that does not comply with the requirements of the Equal Protection Clause.

Plaintiffs request that the temporary restraining order last until such time as the parties shall brief, and the Court shall decide, a motion for a preliminary injunction.

Dated: September 26, 2020                    Respectfully submitted,

/s/ Nicole J. Moss                           /s/ Nathan A. Huff
COOPER & KIRK, PLLC                          PHELPS DUNBAR LLP
David H. Thompson*                           4140 ParkLake Avenue, Suite 100
Peter A. Patterson *                         Raleigh, North Carolina 27612
Brian Barnes*                                Telephone: (919) 789-5300
Nicole J. Moss (State Bar No. 31958)         Fax: (919) 789-5301
1523 New Hampshire Avenue, N.W.              nathan.huff@phelps.com
Washington, D.C. 20036                       State Bar No. 40626
(202) 220-9600                               Local Civil Rule 83.1 Counsel for
(202) 220-9601                               Plaintiffs Phil Berger, Tim Moore, Bobby
nmoss@cooperkirk.com                         Heath, and Maxine Whitley
*Special Appearance Pursuant to Local
Civil Rule 83.1 forthcoming

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.2(f)(3), the undersigned counsel hereby certifies that the foregoing Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order, including body, headings, and footnotes, contains 7265 words as measured by Microsoft Word.

/s/ Nicole J. Moss
Nicole J. Moss

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of September, 2020, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing, and served on counsel registered to receive CM/ECF notifications in this case. I also caused the foregoing document to be e-mailed to the following counsel for Defendants:

Alexander McC. Peters
State Bar No. 13654
Chief Deputy Attorney General
Terrance Steed
N.C. Dept. of Justice
P.O. Box 629
Raleigh N.C. 27602
apeters@ncdoj.gov
tsteed@ncdoj.gov

Paul M. Cox
Special Deputy Attorney General
N.C. Department of Justice
pcox@ncdoj.gov

Katelyn Love
430 N. Salisbury St.
Raleigh, N.C. 27603
Katelyn.Love@ncsbe.gov

*Counsel for the Defendants*